600 P.2d 294

STATE of New Mexico HEALTH AND SOCIAL SERVICES DEPARTMENT, Petitioner-Appellee,

v.

Peggy SMITH, Respondent-Appellant.

No. 3614.

Court of Appeals of New Mexico.

Jan. 9, 1979.

Manuel J. Lopez, Southern New Mexico Legal Services, Clovis, for respondent-appellant.

Jeff Bingaman, Atty. Gen., Julia C. Southerland; Garry Wamser, Asst. Attys. Gen., Santa Fe, for petitioner-appellee.

## OPINION

WOOD, Chief Judge.

This appeal involves the termination of the parental right of the mother of a child, approximately 2½ years old at the termination hearing. The mother's appeal raises issues as to the trial court's findings, which need not be discussed, either because the particular finding is supported by substantial evidence or because irrelevant to the decision. We discuss: (1) Evidence Rule 504, the psychotherapist-patient privilege, and (2) requirements for termination of the mother's parental right.

The child, whose father is unknown, was born October 15, 1975; the child had been in foster care with the H.S.S.D. (Health and Social Services Department) for over two years at the time of the termination hearing in April, 1978. Thus, the child has not lived with his mother most of its life. The reason was the condition of the mother; she had been "unable to discharge her natural responsibilities as a parent due to mental incapacity, hospitalization and incarceration periods, and the use of alcohol."

*Evidence Rule 504, The Psychotherapist-Patient Privilege*

Dr. Lowe testified as to the mother's mental condition. The trial court found:

Dr. William R. Lowe is a licensed psychologist in the State of New Mexico, and he has over the past three (3) years examined, counselled, and treated Peggy Smith pursuant to court commitment while she was confined to the New Mexico State Hospital, Las Vegas and while incarcerated in the Clovis City Jail, and at the request of personnel of HSSD. Substantial evidence supports this finding.

The mother objected to Dr. Lowe testifying, claiming the privilege stated in Evidence Rule 504(b), against disclosure of confidential communications. The mother tendered nothing indicating any communication was "confidential", that is, "not intended to be disclosed". See *State v. Gallegos*, 92 N.M. 370, 588 P.2d 1045 (Ct.App.1978) cert. denied, 92 N.M. 353, 588 P.2d 554 (1978). Rather, the mother's argument centers on the meaning of communication. She argues that communication means more than the oral communication of the patient to the psychotherapist. See *Williams v. City of Gallup*, 77 N.M. 286, 421 P.2d 804 (1966). Dr. Lowe's testimony was based on his examinations, counseling, and treatment of the mother over a three-year period. The mother asserts the examinations, counseling, and treatment all involve communication and, therefore, Dr. Lowe's testimony should have been excluded because in violation of the privilege. We do not answer this contention.

■ Assuming, but not deciding, that communication has the broad meaning asserted by the mother, a part of the communications were in connection with court ordered examinations of the mother's mental condition. Communications made in the course of those examinations were not privileged with respect to the particular purpose of the examination unless the judge ordered otherwise. Evidence Rule 504(d)(2). The judge did not order otherwise. To the extent Dr. Lowe's testimony was based on court ordered examinations, there was no privilege. *State v. Milton*, 86 N.M. 639, 526 P.2d 436 (Ct.App.1974).

■ The mother objected to Dr. Lowe's testimony in its entirety. She did not attempt to distinguish between non-privileged testimony and testimony allegedly subject to the privilege. Since the objection went to the entire testimony, the objection was properly overruled. *State v. Carlton*, 83 N.M. 644, 495 P.2d 1091 (Ct.App.1972).

*Requirements for Termination of the Mother's Parental Right*

The termination of the mother's parental right was under § 40–7–4, N.M.S.A.1978. The trial court found the mother was unfit; thus, the specific ground for termination was § 40–7–4(A)(3), which reads:

(3) the parent is unfit, that is, the parent has repeatedly or continually neglected or willfully abused the child, or failed or refused to perform the natural and legal obligations of care and support; and because of such parental conduct the minor has suffered serious physical, mental or emotional harm; and such parental conduct will probably continue and the continuation of such parental conduct will probably cause further and serious harm to the minor and the disintegration of the parent-child relationship.

The quoted provision states four components for an "unfit" finding:

(a) The parent has repeatedly or continually neglected or willfully abused the child, or failed or refused to perform the natural or legal obligations of care and support.

(b) Because of such parental conduct the child has suffered serious physical, mental or emotional harm.

(c) The parental conduct will probably continue.

(d) The continuation of such parental conduct will probably cause further and serious harm to the child and the disintegration of the parent-child relationship.

The mother asserts that mental illness was an insufficient basis to terminate her parental right. We agree, in this case the requirements for "unfit" must have been met. The mother asserts her parental right was terminated on the ground that she was unable to care for the child because of mental illness. We disagree.

The trial court found that the child had been placed in the custody of H.S.S.D. "[p]ursuant to a determination . . . . that the child was dependent and neglected". Other findings are to the effect that the mother had failed to perform the natural and legal obligations of care and support because of mental illness. These findings went to component (a).

The trial court found the child had been subjected to mental or emotional harm; this went to component (b).

The trial court found that the mother's mental illness was continuing "and no indication exists that she will ever improve"; this went to component (c).

The trial court found that "[c]ontinuation of this atmosphere will probably cause further harm to the child and the disintegration of the parent-child relationship"; this went to component (d).

■ Although the trial court made findings directed to each of the statutory components, such findings were not required. The trial court was only required to find the ultimate fact. The ultimate fact was that the mother was unfit. The trial court was not required to make findings as to the components of "unfit" because those components were not ultimate facts. See *McCleskey v. N. C. Ribble Company*, 80 N.M. 345, 455 P.2d 849 (Ct.App.1969).

Having found the ultimate fact that the mother was unfit, the appellate issue does not involve the sufficiency of *findings* as to the components of "unfit"; rather, the appellate issue is whether there was substantial *evidence* of each of the components so that the finding of the ultimate fact was supported by the evidence.

There is no serious claim concerning the sufficiency of the evidence as to components (a), (c) or (d). The mother contends, however, that there is no substantial evidence as to component (b), that because of parental conduct, the child has suffered serious physical, mental or emotional harm. The mother refers us to evidence concerning the physical condition of the child after visiting the mother and asserts the physical

harm was not "serious". We do not review this evidence because the trial court findings, even though not required, show the trial court did not rule that the child suffered serious physical harm. The trial court found that the child suffered mental or emotional harm.

Prior to the 1975 amendment to § 40–7–4, supra, the required showing as to "serious harm" was stated in the alternative; the requirement was that "the minor is suffering or will probably suffer serious . . . harm." The statutory wording, prior to the 1975 amendment, is quoted in Judge Hernandez' specially concurring opinion in *Huey v. Lente*, 85 N.M. 585, 514 P.2d 1081 (Ct.App.1973). Judge Hernandez' opinion was approved by the Supreme Court. *Huey*, supra, 85 N.M. 597, 514 P.2d 1093 (1973). As presently worded, however, § 40–7–4(A)(3), supra, requires evidence that the child *has suffered* serious harm and evidence that parental conduct probably *will cause further* serious harm.

The mother's evidentiary attack asserts an insufficiency of evidence that the child has suffered serious harm; she does not assert an insufficiency of evidence as to serious harm in the future. In this case, the evidence as to harm is interrelated; specifically, evidence as to future harm bears on the question of existing harm.

■ What is the meaning of "serious harm" in § 40–7–4(A)(3), supra? *Silva v. State*, 152 Tex.Cr.R. 545, 215 S.W.2d 887 (1948) held that "serious injury" meant an injury as would give rise to apprehension or attended with danger. Similarly, "serious harm" means harm giving rise to apprehension or attended with danger. Whether "serious harm" exists must be determined according to the particular facts of each case. See *State v. Jones*, 258 N.C. 89, 128 S.E.2d 1 (1962).

■ The conduct of the mother, considered here, is the failure to perform the natural obligation of care and support. This obligation was to personally care for, support, educate, give moral and spiritual guidance, and provide a home and the love

and security which a home provides. See *Adoption of Doe*, 89 N.M. 606, 555 P.2d 906 (Ct.App.1976). The evidence shows a consequence of the mother's failure was the absence of a parent-child relationship.

As a result of the mother's conduct, custody of the child was awarded to H.S.S.D. Another result was that the child was placed with foster parents, a temporary arrangement. See *Huey v. Lente*, supra; see also *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14, (1977).

An obvious mental or emotional harm to the child was the absence of a parent-child relationship—the absence of the performance of the parental obligation. The trial court could properly view this harm as serious; that is, giving rise to apprehension or attended with danger, for three reasons. First, the turnover among the social workers who supervised the child's foster care arrangements. Three had been assigned to the child's case. Second, the child had been with foster parents for over two years. Although the same foster parents had cared for the child most of this time, it nevertheless was a temporary arrangement attended with the danger that the child would develop deep emotional ties with the foster parents. Third, the social workers had affirmatively sought to restore a parent-child relationship through visitations. The efforts were unsuccessful. During the last visitation arrangement, of visits of approximately one hour in the presence of the social worker, the mother's acceptance of the child rarely lasted longer than thirty minutes. Thus, it is clear that the child will not be returned to the mother.

*Smith v. Organization of Foster Families*, supra, states:

> It is not surprising then that many children, particularly those that enter foster care at a very early age and have little or no contact with their natural parents during extended stays in foster care, often develop deep emotional ties with their foster parents.
>
> Yet such ties do not seem to be regarded as obstacles to transfer of the child from one foster placement to another. . . . The intended stability of the foster-home management is further damaged by the rapid turnover among social work professionals who supervise the foster-care arrangements on behalf of the State. . . . Moreover, even when it is clear that a foster child will not be returned to his natural parents, it is rare that he achieves a stable home life through final termination of parental ties and adoption into a new permanent family.

The considerations in this quotation apply to this case.

The mother contends that even if there was evidence that the child had suffered serious mental or emotional harm, that evidence was not "clear and convincing" as required by § 40–7–4(F), supra. "Clear and convincing" evidence is defined in *Matter of Valdez*, 88 N.M. 338, 540 P.2d 818 (1975). The evidence met this standard.

The decision and judgment of the trial court are affirmed.

IT IS SO ORDERED.

HERNANDEZ and LOPEZ, JJ., concur.